**Attachment C, Search Warrant, Montana Rifle Company, 3178 MT Highway 35, Kalispell Montana and Seven Sons Rifle Barrels, Inc., 3172 MT Highway 35, Kalispell Montana**

1.      My name is Kelly J. Siler.  I am a Special Agent for the United States Environmental

Protection Agency (EPA), Criminal Investigations Division (CID), Helena Residence Office in

Helena, Montana.  My office primarily conducts investigations in Montana; however, the EPA

Regional CID Office, in Denver, Colorado, to whom my office reports, conducts investigations

in Montana, Colorado, Utah, Wyoming, North Dakota and South Dakota.  I have been employed

as a federal law enforcement agent for approximately 15 years.  During that time, I held a law

enforcement position as a Special Agent with the United States Air Force Office of Special

Investigations (AFOSI) for seven years.  Following my separation from active duty in September

2008, I enlisted in the United States Air Force Reserve and continued to serve in that capacity as

an AFOSI Reserve Special Agent, until my retirement in January 2013.  I served a total of 21

years with the US Air Force and attained the rank of Master Sergeant.  I have been a Special

Agent with EPA-CID since August 2009.  As an EPA-CID Special Agent, my responsibilities

include, but are not limited to, conducting criminal investigations of alleged violations of Federal

Environmental Statutes, those laws aimed at protecting Human Health and the Environment,

such as the Resource Conservation and Recovery Act (RCRA) (Title 42 U.S.C. § 6901, et seq).

As a part of my training and experience, I have received training on RCRA and reviewed

portions of the RCRA implementing regulations.  In the course of this investigation, I have also

discussed the RCRA laws and regulations with scientists and engineers employed by the EPA

and the State of Montana Department of Environmental Quality (MDEQ).  Pursuant to Title 18

U.S.C. § 3063, special agents of the U.S. EPA-CID are authorized to apply for and serve

criminal search warrants.

2.      The information in this affidavit is based on my personal knowledge and information

provided to me by other law enforcement officers and individuals.  The information in this

affidavit is provided for the limited purpose of establishing probable cause and is not a complete

statement of all the facts related to this case.

STATUTORY BACKGROUND

**The Resource Conservation and Recovery Act**

3.      The Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq.,

established a comprehensive regulatory program to ensure the safe storage, transportation,

treatment and disposal of hazardous wastes.  RCRA, and EPA regulations promulgated

thereunder at 40 C.F.R. Parts 260 et seq., accomplish the statutory goal through a "cradle to

grave" regulatory system to manage and track hazardous waste from generation to final treatment

or disposal at permitted facilities.  EPA regulations impose separate regulatory requirements for

(1) generators [40 C.F.R. Part 262]; (2) transporters [40 C.F.R. Part 263]; and (3) treatment,

storage and disposal facilities (TSDF's) [40 C.F.R. Parts 264 (permitted facilities), 265 (facilities

with "interim status," and 270 (permit requirements)].

4.      RCRA allows states to seek authorization to implement and enforce state hazardous

waste programs in lieu of the federal hazardous waste programs.  42 U.S.C. § 6926; 49 C.F.R.

Part 271.  State hazardous waste programs may be authorized if they are deemed to be equivalent

to and consistent with the federal program.  42 U.S.C. 6926(b).    The State of Montana has a

hazardous waste management program authorized by EPA pursuant to RCRA.  40 C.F.R. Part

272, Subpart BB – Montana.  Montana's hazardous waste regulations incorporate the federal

RCRA regulations by reference, with some state specific differences.  Administrative Rules of

Montana (ARM) Title 17, Chapter 53.  For purposes of describing hazardous waste regulatory

requirements, the affidavit will refer to federal RCRA statute and regulations (to which the authorized state programs are substantially equivalent and consistent), unless specific reference to a state's authorized provision is necessary.

## Definition of Hazardous Waste

5.      RCRA, at 42 U.S.C. § 6903(5), defines "hazardous waste" as:

a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical or infectious characteristics may–

(A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness; or

(B) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

6.      RCRA required the EPA to identify and list "solid wastes," as defined in 42 U.S.C. § 6903(27), which meet the statutory definition of hazardous waste (cited above).  Generally, under EPA regulations, a solid waste is considered a hazardous waste if it either (1) exhibits one of four characteristics (ignitability, corrosivity, reactivity, or toxicity) (known as "characteristic" hazardous waste); or (2) is specifically listed as a hazardous waste in the regulations (known as "listed" hazardous waste).  40 C.F.R. §§ 261.3.

## Requirements for Generators of Hazardous Wastes

7.      EPA regulations at 40 C.F.R. Part 262 place varying degrees of regulatory requirements on generators of hazardous waste based upon the volume of waste generated by the generator in a calendar month. *Large Quantity Generators* (generators of more than 1000 kilograms [or about five 55-gallon drums] of hazardous waste per month) ("LQGs") are subject to full

regulation.  *Small Quantity Generators* (generators of between 100 kilograms [about ½ a 55-gallon drum] and 1000 kilograms per month) ("SQGs") are subject to reduced regulatory requirements.  Finally, the regulations identify *Conditionally Exempt Small Quantity Generators* (generators of no more than 100 kilograms per month) ("CESQGs") that are exempt from RCRA regulations provided they meet certain conditions set forth in 40 C.F.R. § 261.5.

8.      Large and Small Quantity Generators are subject for the most part to the same regulatory requirements, except that SQGs may accumulate and store wastes onsite for a longer period of time (180 or 270 days rather than 90 days) without requiring a storage permit.  The generator regulations require both LQGS and SQGs to (1) determine whether their waste is hazardous pursuant to 40 C.F.R. § 262.11; (2) notify EPA as a generator and obtain EPA ID numbers; (3) store accumulated hazardous wastes in specified types of containers or areas in compliance with storage conditions set forth in 40 C.F.R. §262.34; and (4) clearly label such drums or other containers as "hazardous waste" with the date the wastes began to be accumulated.

9.      LQGs and SQGs must also prepare a "hazardous waste manifest" when transporting the waste off-site, as part of RCRA's cradle-to-grave tracking system to ensure that the wastes are properly transported to the permitted hazardous waste treatment, storage, or disposal facilities (TSDF) designated by the generator.  The manifest must contain (1) the generator's name, address, telephone number and EPA ID number; (2) the transporter's name and EPA ID number; (3) the name, address, and EPA ID number of the TSDF designated by the generator to receive its waste; and (4) a description of the type and quantity of each hazardous waste, and the type and number of containers loaded onto the transport vehicle.  The generator retains one copy of the manifest signed by the generator and transporter and gives the remaining copies to the transporter.  If the generator does not receive a signed copy of the manifest from the designated

TSDF within 35 days of shipment, the generator must file an "Exception Report" to EPA.

10.     Generators are required to maintain copies of all signed manifests, and exception reports, as well as any documentation regarding their hazardous waste determinations for a period of three years.  When a shipment of hazardous waste is initiated, the generator selects the transporter and the designated facility that will receive the hazardous waste and identifies them on the manifest.

11.     CESQGs are exempt from hazardous waste regulation provided they meet certain conditions set forth in 40 C.F.R. § 261.5.  To qualify for the exemption, a CESQG must (1) determine whether the waste it generates is hazardous; (2) quantify the amount of hazardous waste generated in a calendar month; and (3) accumulate no more than 1000 kilograms of hazardous waste on-site at any time.  CESQGs may send waste off-site, without a hazardous waste manifest, to certain types of facilities (including municipal landfills) specified in 40 C.F.R. 261.5(g)(3). 12.  The conditional exemption provided for CESQG waste is lost if the exempt waste is mixed with non-exempt waste.   40 C.F.R. 261.5(i) provides that "[i]f any person mixes a solid waste with a hazardous waste that exceeds a quantity exclusion level of this section, the mixture is subject to full regulation."

**Permit Requirements for Treatment, Storage or Disposal of Hazardous Waste**

12.     Hazardous wastes may only be transported to, treated, stored, or disposed of at facilities that have received RCRA permits, or interim status, pursuant to 42 U.S.C. §§ 6925, 6926.  These RCRA permits impose regulatory conditions specifically tailored to the activity of each particular facility, and the facility may only handle those wastes and perform those activities covered by the permit or by interim status.  See 40 C.F.R. Parts 264 and 265.  40 C.F.R. § 260.10 provides the following definitions for treatment, storage, and disposal:

*Treatment* means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste, or so as to recover energy or material resources from the waste, or so as to render such waste non-hazardous, or less hazardous; safer to transport, store, or dispose of; or amenable for recovery, amenable for storage, or reduced in volume.

*Storage* means the holding of hazardous waste for a temporary period, at the end of which the hazardous waste is treated, disposed of, or stored elsewhere.

*Disposal* means the discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters including groundwater.

Under Montana's federally authorized hazardous waste management program, permits for the treatment, storage, and disposal of hazardous waste are required to be obtained from the Montana Department of Environmental Quality (MDEQ). § 75-10-406; ARM § 17.53.1201.

### Prohibition on Land Disposal of Untreated Wastes (Land Disposal Restrictions)

13.    In the 1984 Hazardous and Solid Waste Amendments (HSWA) to RCRA, 42 U.S.C. § 6924, Congress prohibited the land disposal of *untreated* hazardous wastes, and directed EPA to set treatment levels or methods of treatment required before an otherwise prohibited waste may be land disposed.  In response, EPA promulgated land disposal restriction (LDR) regulations at 40 C.F.R. Part 268, which "identifies hazardous wastes restricted from land disposal and defines

those limited circumstances under which an otherwise prohibited waste may continue to be land

disposed." 40 C.F.R. § 268.1(a). The LDR regulations generally apply to generators and

transporters of hazardous waste as well as owners and operators of hazardous waste treatment,

storage, and disposal facilities. 40 C.F.R. § 268.1(b). The LDR regulations are also expressly

considered as "material conditions or requirements" of Part 265 interim status standards. 40

C.F.R. § 265.1(e). As described more fully below in the discussion of the criminal provisions of

RCRA, knowing violations of material conditions or requirements of interim status requirements

are subject to criminal prosecution.

**Criminal Provisions of RCRA**

14.     The criminal enforcement provisions of the RCRA, 42 U.S.C. § 6928(d), list a number of

criminal violations and penalties. It provides, among other things, that "Any person who"--

(1) knowingly transports or causes to be transported any hazardous wastes

identified or listed under RCRA to a facility which does not have a permit;

(2) knowingly treats, stores, or disposes of any hazardous wastes identified or

listed under RCRA–

(A) without a permit; or

(B) in knowing violation of any material condition or requirement

of such permit; or

(C) in knowing violation of any material condition or requirement

of any applicable interim status regulations or standards;

(3) knowingly omits material information or makes any false material statement

or representation in any application, label, manifest, record, report, permit, or

other document filed, maintained, or used for purposes of compliance with EPA

regulations (or state regulations in case of an authorized state program);

(4) knowingly generates, stores, treats, transports, disposes of . . . or otherwise handles any hazardous waste ... and who knowingly destroys, alters, conceals, of fails to file any record, application, manifest, report, or other document required to maintained or filed for purposes of compliance with EPA regulations (or state regulations in the case of an authorized state program); or

(5) knowingly transports without a manifest or causes to be transported without a manifest, any hazardous waste . . . required by EPA regulations (or state regulations in the case of an authorized state program) to be accompanied by a manifest;

commits a criminal offense and is subject to a fine of not more than $50,000 for each day of violation, or imprisonment up to 5 years [for violations of paragraphs (1) or (2)], or for imprisonment up to 2 years [for violations of paragraphs (3), (4) or (5)], or both fine and imprisonment.

15.    RCRA required EPA to promulgate recordkeeping requirements for generators and transporters of hazardous waste, and for hazardous waste treatment, storage and disposal facilities.  42 U.S.C. §§ 6922(a)(1), 6923(a)(1), 6924(a)(1).  EPA promulgated recordkeeping regulations for generators of hazardous waste, 40 C.F.R. § 262.40 - § 262.44, recordkeeping regulations for transporters of hazardous waste, 40 C.F.R. § 263.22, and recordkeeping regulations for treatment, storage and disposal facilities, 40 C.F.R. § 264.70 - § 264.77.

## CASE BACKGROUND

16.    In preparation of this affidavit, I have conducted reviews of open source media, internet searches, including Bing and Google, reviewed the Montana Secretary of State Business License

Registry and reviews of Lexis/Nexis, where I uncovered the following information related to the history, corporate structure and corporate relationship between the companies listed in this affidavit. To date, I have found the following, which is a compilation of information gathered from the previously listed sources: In 1990, Keith Sipe, a gunsmith in Kalispell, MT, started the Montana Rifleman Inc., which initially specialized in firearms repair. In 1993, Sipe began making custom barrels for hunting rifles. Sipe began manufacturing custom hunting rifles in 1995, using existing parts; however, when those parts became unavailable, he began designing his own variation of the Mauser action. In 1999, he began manufacturing these actions and building custom rifles. It was about this same time that the Montana Rifle Company was formed. In 2007, ownership of Montana Rifle Company was transferred to Keith Sipe's son, Jeff Sipe. In October 2010, the Montana Firearms Group was created and was listed as DBA Montana Rifle Company. By 2011, the Montana Rifleman was one of the largest barrel manufacturers in the world and Montana Rifle Company became a "full production" rifle company, meaning they essentially made every major component "in-house", that was needed to build each rifle. In March 2013, Remington Arms Co. acquired Montana Rifleman, for an undisclosed amount. It was reported that in 2011, Montana Rifleman produced 143,000 rifle and pistol barrels and they exceeded 312,000 barrels, with a workforce of 160 to 170 people, in 2012. Remington Arms operated the barrel manufacturing facility on the same site, until they relocated the business to Alabama in May 2014. Seven Sons Rifle Barrel, Inc., was established in December 2015; however, they are listed with a registered agent and show no corporate linkage to Montana Firearms Group or Montana Rifle Company. A Lexis/Nexis business search identified Jeff Sipe as the President of Seven Sons Rifle Barrels, Inc. These searches also

disclosed that Jeff Sipe held various positions at Montana Rifle Company, including currently being the President.

17.     Throughout this document I refer to two buildings. To assist in understanding the layout of the property and where each building to be searched is located, I will refer to the MRC building, located at 3178 MT-35, Kalispell MT and "Bldg 1" and the SSRB building, located at 3172 MT-35, Kalispell MT, as "Bldg 2". For further clarification, please refer to descriptions and the aerial map in Attachment A.

18.     On 2/21/2017, I received a complaint, through the Criminal Tip-Complaint System, from Spencer Blaney. In the complaint, Blaney, an employee of Montana Rifle Company/Seven Sons Rifle Barrels (MRC/SSRB), alleged the company was dumping hazardous chemicals outside on the ground, as well as dumping acid down the sink drain inside the building.

19.     On 2/23/17, I contacted Blaney, via telephone, and conducted an interview. Blaney informed me he currently worked at MRC/SSRB as a drill operator. He stated his duties included drilling rifle barrels. He stated he has been working for the company for approximately 5-6 months, and he had previously worked for them for 1-2 months, about two years ago.

20.     Blaney stated that his duties included drilling out the barrels and acid washing them. He explained the process as follows: Once the barrels are ready to be acid washed, foremen in the shop provide him a 5-gallon bucket of chemicals. He would take a barrel from a rack, plug one end of the barrel and place it in a sink. He would then place approximately one cup of the solution into the barrel, where it would remain for a few minutes. After the solution was in the barrel for the required time, he would dump it down the sink drain inside Bldg 2. Blaney stated he was trained to do this, to include dumping it down the sink, and if he did not follow this

process, he would be "written up". He stated he did not know exactly what was in the solution, except for an acid, which he thought was "numeric" acid.

21.     Blaney advised that his shift consisted of 8-10 employees, who worked four 10 hour shifts each week, from 3:30PM to 2:00AM. He advised that Zane, Bridger and Casey were leaders on his shift and Zane was his shift foreman; however, Blaney did not know any of their last names. Blaney stated Zane, his foreman, would mix the chemicals in a 5-gallon bucket for Blaney to use in the barrels. Blaney estimated that during a normal shift, he used approximately 2-3 gallons of the acid wash, which he stated would all go down the sink drain. He stated that when the 5-gallon bucket was about ½ full, which was typically at the end of his shift, it was either poured down the sink drain, or poured outside the building (Bldg 2), on the ground. He stated this disposal method was passed down from management to the shop supervisors and was the method the company used to dispose of this material.

22.     Blaney stated he did not know where the drains from the buildings went; however, he assumed it was to the sewer or a septic tank. Blaney advised that his shift typically manufactured 1000-1500 barrels per week, and stated that all of the chemicals used on the barrels ended up down the drains or outside on the ground. Blaney recalled a conversation he had with Zane, his foreman, regarding the disposal of the waste and Zane told him that if the EPA was called, they would be "shut down so damn quick". Blaney advised that several other employees were aware the waste was being placed down the drain and he stated he reported it because of his concern that there could be an impact to drinking water and he did not want his family being exposed to this type of issue.

23.     On 5/18/2017, I held a telephonic meeting with the Montana Department of Environmental Quality (MDEQ) RCRA Office Supervisor, Mark Hall and MDEQ RCRA

Inspector Cory Makita, to discuss any previous MDEQ RCRA inspections of MRC/SSRB.
Makita and Hall advised that neither MRC or SSRB had registered as a generator of hazardous
waste with MDEQ. Additionally, they stated that neither MRC or SSRB had a permit to treat,
store or dispose of hazardous waste. Because of this, MDEQ had not conducted any inspection
of the facilities, nor did they have any information of potential hazardous waste generation at the
facility. I, along with EPA-CID Resident Agent in Charge (RAC) Robert Marsden, informed
both Hall and Makita that we would keep them apprised of our investigation; however, they
should follow their normal protocol based on the information we provided to them.

24.     On 5/19/2017, I received an email from Hall, which was forwarded to the MDEQ
Enforcement Office, from the EPA Region 8 RCRA office. The email, dated 5/5/2017, with the
subject line "complaint regarding Montana Rifle Company, located in Kalispell, Montana" was
sent from Linda Jacobson, Reg 8 RCRA to Mike Reiger, MDEQ Enforcement, for MDEQ to
follow-up on the information. The following is a synopsis of the email: Jacobson stated she
received a complaint from Cameron Cox, a former employee (at MRC), that the company was
pouring chemicals down the sink. She stated she had spoken to Cox that day and he told her that
they pour solvents and acids outside behind the building (Bldg 2), down the sinks and down the
drains. Cox told Jacobson that he had witnessed this activity and stated there were other
employees who had witnessed it as well. Cox stated they poured items down the sinks daily and
either outside, or down the drains weekly or monthly. Cox stated there was a drinking water well
on the property which could not be used for drinking water and he believed the building was on a
septic system. He also stated he observed oil leaking out of drums, but he was not more specific.

25.     Based on this information, MDEQ attempted to conduct a RCRA inspection of the
MRC/SSRB facility ("the site") on 6/2/2017. On 6/9/2017, EPA-CID and MDEQ held a meeting

to discuss the findings of this inspection.  On 6/28/2017, SA Siler received a copy of Makita's
Field Investigation Report regarding this site visit.  Makita and Margarite Thomas, MDEQ
Enforcement, informed me that on 6/2/2017, they arrived at the site around 1300hrs and after
driving through the parking lot, were directed to a building (Bldg 1) on the east side of the
property.  Before reaching this building, they observed a couple of large totes, containing liquid,
behind a building.  Makita told me that upon entering the front door of the building, he saw a
desk, with a computer on it and stated that down the hall behind this desk area, appeared to be
other offices; however, he did not go down the hallway.  He stated that moments later Jeff Sipe,
Chief Executive Officer (CEO) of MRC, came down the stairs and met with them.  Makita and
Thomas identified themselves and explained they were there to conduct a hazardous waste field
inspection, based on an anonymous complaint of illegal disposal of hazardous waste.  Sipe
responded this happens "whenever we fire a piece of shit employee".  Makita informed Sipe that
the complaint indicated MRC poured hazardous waste outside on the ground and down the rifle
barrels, into the sink.  Sipe stated MRC did not generate hazardous waste.  Makita then informed
Sipe that the complaint indicated they poured solvents, acids and other chemicals down the rifle
barrels, which went down the sinks into the septic system.  Makita asked Sipe about the barrel
manufacturing process, the pouring of chemicals into the barrels and the disposal of that waste.
Sipe told Makita that they did not make barrels.  Makita then asked Sipe if they could tour the
facility (Bldg 1) to evaluate their hazardous waste processes, satellite accumulation, chemical
storage areas and management practices, and to provide MRC with compliance assistance.  Sipe
refused them entry and asked why they needed to go through the manufacturing area.  Makita
repeated that he needed to review the process and provide compliance assistance.  Makita asked
Sipe why MDEQ could not tour the building and Sipe replied that he did not want employees

seeing them (MDEQ), because that could lead to employees feeling they could retaliate if they were fired and he stated their manufacturing processes were proprietary. Makita told Sipe that he had inspected several other firearms manufacturers in the area and most of them were either small or large quantity generators of hazardous waste. Makita informed Sipe that they (MDEQ) could get a warrant to conduct the inspection, but it would be easier for them to do a walkthrough and provide assistance. Sipe replied that they would need to get a warrant. Additionally, Sipe informed Makita and Thomas that they had recently been visited by OSHA due to a complaint and they (MRC) recently had the septic tank tested and pumped, because of the complaints made against them. Makita asked for the results of those tests and inquired about who pumped the tank, but Sipe could not provide that information. Sipe told MDEQ that he wanted to contact the owner, so MDEQ agreed to return in one hour.

26.    Makita and Thomas returned at approximately 1500hrs, 6/2/2017, and were met by Blue Santee from HUB International Insurance, who was representing MRC. Santee asked Makita why MDEQ was there and Makita informed him they were there to investigate the complaint and provide compliance assistance. Santee asked why they would respond to complaints from ex-employees, because they were usually invalid. Makita informed Santee that they do not discriminate regarding the source of the complaint. Chris Hanford, a MRC employee, arrived and provided a binder of Safety Data Sheets (SDSs) for the products MRC used on the site. After briefly reviewing the 4-5-inch-thick binder, Makita notified them both, that a few of the entries, if they became wastes, would be considered hazardous wastes. Makita informed Santee that he would like to inspect the facility (Bldg 1) to review the processes and waste streams to determine the company's hazardous waste status. Makita told both Santee and Hanford about his

inspections of other firearms companies in the area and the fact that most were registered as small or large quantity generators. MDEQ was still refused entry.

27.     MDEQ was allowed to inspect a loading dock area and the alleged dumping area, both outside, behind the Bldg 1. Makita observed a small patch of staining on the gravel, but noted in his report that the area was mostly covered with new gravel and spring vegetation. Makita recommended that MRC clean up the spill and dispose of the soil. During this time, Makita and Thomas noted that during their initial visit earlier in the day, there were two totes on the back loading area, but now, there was only one. As an exit interview, Makita informed Sipe and Santee that he recommended they (MRC) hire a hazardous waste consultant to evaluate their hazardous waste generation and management practices. Makita and Thomas informed me that they were never informed MRC and/or SSRB were operating out of Bldg 2; therefore, they did not have a reason to ask about conducting an inspection of that building.

28.     On 6/19/2017, I travelled to Kalispell, MT to conduct investigative work regarding this matter. At approximately 1330hrs, I drove through the parking lot at the site. I personally observed people inside a building (Bldg 2), which I later discovered was the building where SSRB manufactured rifle barrels. The people in this building were working with long cylindrical pieces of metal, which appeared to be rifle barrels. Additionally, I observed three large totes, behind this same building (Bldg 2), which were filled with varying levels (from 1/3 to 2/3 full) of dark colored liquid. I was unable to see markings or labeling on the totes. I also observed numerous 6" to 12" pieces of round metal in a wooden crate, adjacent to the totes. Many of these pieces appeared to have drill holes in one end. Based on my firearms experience in the military and law enforcement, these pieces looked like they had been partially drilled to make rifle barrels. Additionally, based on my experience, it appeared that the personnel in this

building (Bldg 2) were manufacturing rifle barrels, which would be inconsistent with Sipe's statement to MDEQ on 6/2/2017, wherein he stated they did not make rifle barrels.

29.     On 6/19/2017, I conducted an interview of Cameron Cox, the former employee who filed a complaint with EPA Region 8 earlier in June 2017.  Cox, who had worked at the MRC/SSRB until he was laid off approximately 3-4 months prior to the interview (February-March 2017), explained that he had been working for MRC/SSRB since January 2015.  Cox explained that he initially worked for Remington Arms, who purchased the rifle manufacturing operations from MRC sometime in March 2013.  Cox could not recall when he began working for Remington, but stated he was there until early summer 2014, when he was laid off after Remington relocated their operations out of Montana.  He was re-hired by MRC in January 2015, worked for a few months, in Bldg 1, and was then "fired", along with several other employees, and immediately re-hired by the newly created SSRB company.

30.     Cox explained that during his employment with MRC, then SSRB, his primary duties were as a machine operator, making rifle barrels.  He stated he worked in the barrel shop, which at that time, was located in Bldg 1.  Cox stated he was briefly promoted to foreman, but was replaced not long after his promotion for unknown reasons, and he explained this was common with other employees as well.  He stated he worked four 10hr shifts each week, from 3:30pm to 2:00am.  He stated that each shift had between 12-15 employees and they would work four days on and four days off.  He told me that after his most recent lay off, he was rehired by MRC for a couple of days, then they fired him for no explanation.

31.     Cox explained the barrel making process he used at MRC/SSRB as follows:  He would take a piece of metal and cut it to length, then bore a hole down the length of the metal.  He would then ream the inside of the barrel, which would leave small rings/grooves inside the

barrel. The next step involved them pouring a "solution", which contained muriatic acid and other chemicals that Cox was unfamiliar with, down the barrel, after one end was plugged. He stated the solution would remain in the barrel for a specified period of time, before he pulled the plug out and the solution was allowed to go down the sink drain, or would be placed into a bucket, which was either poured down the drain or outside on the ground. Cox stated the solution was good for only one use and he estimated they produced 4-5 gallons of this waste on each shift, or 8-10 gallons per day for the facility. Cox stated that initially he was not allowed to mix the solution, only management personnel, like Hanford, could do this. However, they began letting employees mix the solution as needed and they posted the directions on the wall. Cox stated that he personally dumped this solution down the drain. Cox stated that during his employment, he became concerned about this solution being poured down the drains and he asked Dave Wisher, MRC General Manager, if they were "supposed to pour it down the drain". Wisher told Cox to either pour it down the drain or pour it outside. Cox stated when it was poured outside, it was poured in the tree-line behind the MRC building (Bldg 1). Cox stated he also observed totes containing cutting oil, and barrels containing coolant, which were taken to this same area to be drained.

32.     Cox told me that in the southwest corner of the MRC building (Bldg 1) was a "bluing room", which was used to blue the metal on certain gun parts. He described this tank as approximately 6' long x 18" wide x 18" deep. He stated the chemicals in the bluing tank would burn your skin if it touched you and they kept a bottle of vinegar next to the tank to neutralize the bluing solution if it got onto anyone. Cox stated this tank would sometimes build up "salt" on the outside, which would be knocked off and washed down a drain in the floor. He also stated

there was a spigot on the bottom of the tank, which was used to drain the liquid out of the tank, into the same floor drain. He stated he observed this being done.

33.    Cox stated that he was working for MRC, when OSHA came to inspect the facility. Cox stated that at the time, he was working inside the MRC building (Bldg 1), manufacturing barrels, and the previously mentioned solution, which was poured into the barrels, was being poured down the sink drains inside this building. He stated that prior to OSHA's arrival, the employees were told by management to move this process into a blue shipping container located on the west/southwest corner of the MRC building (Bldg 1). He opined this was to hide the operation from OSHA, but later heard that OSHA may have found the operation and subsequently fined MRC. Cox recalled that a short time after OSHA left, MRC moved the barrel making operation into the back half of the building (Bldg 2) directly west of the MRC building. Cox stated that during his employment with MRC, and then SSRB, he observed this solution being poured down sink drains in both buildings, and this activity was still occurring in the SSRB building when he was laid off in February/March of 2017.

34.    Cox told me that approximately one-month before he was laid off (approximately Jan/Feb 2017), he arrived at worked and observed a large truck, with a hose hooked to it, pulled alongside the MRC building (Bldg 1), which appeared to be pumping out the septic tank. Additionally, Cox stated other employees told him to not drink the water in the buildings, because the wells were contaminated and he would get sick.

35.    Cox stated he had recently spoken to a former co-worker, Bridger (LNU), within a week or so prior to me conducting the 6/19/2017 interview of Cox. Bridger told Cox that when "OSHA" conducted an inspection in early June 2017, they were initially turned away by "management" and after they left, management told the employees of the barrel shop (Bldg 2) to

shut down the operation for the day and go home.   Although Cox was not employed by MRC or

SSRB at the time this event occurred, he felt the only management personnel with the authority

to close down the operation would the Jeff Sipe or Dave Wisher.   Additionally, Bridger told Cox

that management later told the employees they would be sued for $8000, if they (management)

found out who contacted OSHA.   Based on my knowledge of these events, it is likely that

Bridger was confusing OSHA for MDEQ, because MDEQ attempted to conduct their inspection

on 6/2/2017 and OSHA had not been to the site recently.

36.     Cox stated a couple of security cameras had been installed in the SSRB building (Bldg 2),

above the sink, and there was a computer with a "box" hooked to it, on the second floor of that

same building.   Cox believed the cameras recorded to this computer and the owners had the

ability to view the cameras from their smart phones.

37.     Cox stated the majority of the MRC/SSRB management, and office personnel, had

offices in the front (north) end of the MRC building and various machining and rifle assembly

operations occurred in the rear of that building, to include the bluing operation (all in Bldg 1).

He explained the rifle barrels were manufactured in the SSRB building (Bldg 2), immediately to

the west of MRC.   He reiterated that throughout his time working for MRC and SSRB, he had

observed various wastes being poured down the drains in both buildings.   He explained that he

did not report this earlier, because he needed the job and felt that he would be fired, or sued, if he

reported the information.

38.     On 7/25/2017, I consulted with MDEQ's Makita on various regulatory matters regarding

this investigation.   First, I provided Makita with the estimated volumes of acidic waste being

generated by MRC/SSRB, during the barrel making processes.   This information was based on

the volumes provided by both Blaney and Cox, during their respective interviews (both stated

they were given a 5-gallon bucket full of the mixture, which was used in the manufacture of the rifle barrels, and all of this was either poured down the drain, or outside on the ground). Furthermore, Cox estimated the facility used 10-gallons of this mixture each day.  Using this information, Makita provided the following calculations:  He estimated each gallon would weight approximately 8 pounds x 10 gallons per day, equaling 80 pounds of waste generated daily.  80 pounds each day x five (5) days in a work week, would be 400 pounds per week and four weeks in a month, would equal approximately 1600 pounds of hazardous waste being generated monthly.  Makita noted this was a conservative estimate, because he had no way of knowing what other hazardous wastes were being generated on site.  Additionally, he stated this would place MRC/SSRB into a small quantity generator status, because they were generating more than 220 pounds per month of hazardous waste.

39.    Makita also stated it was his experience, gained while conducting multiple RCRA regulatory inspections of firearms/rifle barrel manufacturers within Montana, that these companies often times generated numerous waste streams, to include oils, paints, solvents, acids and corrosives, heavy metals in chemical baths for metal plating and "bluing" as well as halogenated and chlorinated oils.  He recalled seeing the SDSs while at the site on 6/2/2017 and stated he saw solvents and ignitable materials listed within these documents, although he could not recall specific names of the materials.

40.    Makita recalled telling Sipe and Santee, during his exit interview before leaving the property on 6/2/2017, that they needed to contact a hazardous waste consulting company, who could evaluate the hazardous waste generation on site and advise them on their RCRA generator status. On 7/25/2017, Makita told me MRC/SSRB had not updated their generator status, nor had they informed MDEQ that they were working with a consultant.

41.     On 7/28/2017, I spoke with David Parker, Acting Chief of Infrastructure and Support,

National Enforcement Investigations Center (NEIC), US EPA, Denver, CO.  Parker advised that

most of his previous experience within the EPA has been in the field of drinking water.  He holds

a BS in Biology, with a minor in Chemistry. He holds a MS in Geology and Environmental

Engineering, from John Hopkins University, where he focused his studies on drinking water

treatment.  Before moving to NEIC, he was the EPA Region 4 Drinking Water Program

Manager, and is considered an expert in the field, having testified as an expert during several

civil and criminal proceedings. I provided Parker with a brief overview of this case and asked

Parker to provide an assessment on the potential impact of wastes, such as heavy metals, acids,

sodium nitrates and nitrites, on drinking water.  Parker stated that it was his experience and

professional assessment that the chemicals used in the bluing process, specifically the "salts",

such as sodium nitrate and sodium nitrite, would readily migrate through the soil and impact

ground water, which is often times an aquifer for well/drinking water.  He stated that nitrates and

nitrites do not bind with soils and they do not change chemically under most conditions;

therefore, they migrate quickly and readily into the water table.  Parker stated a major concern

with nitrates is they are an "acute" health risk, meaning that it does not take large doses or

exposure levels to negatively impact human health.  He stated very small children were

especially susceptible, because exposure in this population can lead to an issue called

methemoglobinemia, or blue baby syndrome.  He stated the nitrates essentially bind with the red

blood cells, which prevents the proper exchange of oxygen within the body and can lead to major

health issues, including death.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

42.     As described above and in Attachment B, this application seeks permission to search and

seize records that might be found on the property described in Attachment A, in whatever form

they are found.  One form in which the records might be found is stored on a computer's hard

drive or other storage media.  Some of these electronic records might take the form of files,

documents, and other data that is user-generated.  Some of these electronic records, as explained

below, might take a form that becomes meaningful only upon forensic analysis.

43.     I submit that if a computer or storage medium is found on the premises, there is probable

cause to believe those records will be stored in that computer or storage medium, for at least the

following reasons:

44.     Based on my knowledge, training, and experience, I know that computer files or

remnants of such files can be recovered months or even years after they have been downloaded

onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a

storage medium can be stored for years at little or no cost.  Even when files have been deleted,

they can be recovered months or years later using forensic tools.  This is so because when a

person "deletes" a file on a computer, the data contained in the file does not actually disappear;

rather, that data remains on the storage medium until it is overwritten by new data.

45.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack

space—that is, in space on the storage medium that is not currently being used by an active

file—for long periods of time before they are overwritten.  In addition, a computer's operating

system may also keep a record of deleted data in a "swap" or "recovery" file.

46.     Wholly apart from user-generated files, computer storage media—in particular,

computers' internal hard drives—contain electronic evidence of how a computer has been used,

what it has been used for, and who has used it. This evidence can take the form of operating

system configurations, artifacts from operating system or application operation, file system data

structures, and virtual memory "swap" or paging files. Computer users typically do not erase or

delete this evidence, because special software is typically required for that task. However, it is

technically possible to delete this information.

47.     Similarly, files that have been viewed via the Internet are sometimes automatically

downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed

amount of hard drive space devoted to these files, and the files are only overwritten as they are

replaced with more recently viewed Internet pages or if a user takes steps to delete them.

48.     Based on information provided by MDEQ's Cory Makita described in paragraph 25

above, and by former employee Cameron Cox described in paragraph 36 above, there is reason

to believe that there are computer systems and computer storage media currently located on the

premises described in Attachment A and more specifically in both Bldg 1 and 2.

49.     As further described in Attachment B, this application seeks permission to locate not only

computer files that might serve as direct evidence of the crimes described on the warrant, but

also for evidence that establishes how computers were used, the purpose of their use, who used

them, and when.

50.     Although some of the records called for by this warrant might be found in the form of

user-generated documents such as word processor, computer storage media can contain other

forms of electronic evidence as well.

51.     Forensic evidence of how computers were used, the purpose of their use, who used them,

and when, is, as described further in Attachment B, called for by this warrant. Data on the

storage medium not currently associated with any file can provide evidence of a file that was

once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

52.     Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

53.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

54.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed

by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

55.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner.  Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent.  To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the presence of other things found on the storage medium.  I mention the possible existence of malicious software as a theoretical possibility, only; I will not know, until a forensic analysis is conducted, whether malicious software is present in this case.

56.     Searching storage media for the evidence described in the attachments may require a range of data analysis techniques.  It is possible that the storage media located on the premises will contain files and information that are not called for by the warrant.  In rare cases, when circumstances permit, it is possible to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  For example, it is possible, though rare, for a storage medium to be organized in a way where the location of all things called for by the

warrant are immediately apparent. In most cases, however, such techniques may not yield the evidence described in the warrant. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

57.      Based upon my knowledge, training and experience, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

58.      The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been

used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

59.     The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

60.     Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

61.     Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

62.     In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

63.     I recognize that MRC and SSRB are functioning companies with employees, and that a

seizure of the Companies' computers may have the unintended effect of limiting the Companies'

ability to provide service to their legitimate customers.  In response to these concerns, the agents

who execute the search anticipate attempting to create an electronic "image" of the computers

that are likely to store the things described in the warrant.  Generally speaking, imaging is the

taking of a complete electronic picture of the computer's data, including all hidden sectors and

deleted files.  Imaging a computer permits the agents to obtain an exact copy of the computer's

stored data without actually seizing the computer hardware. The agents or qualified computer

experts will then conduct an off-site search for the things described in the warrant from the

"mirror image" copy at a later date.  If the agents successfully image the Company's computers,

the agents will not conduct any additional search or seizure of the Company's computers.   If

imaging proves impractical, or even impossible for technical reasons, then the agents will seize

those components of the Company's computer system that the agents believe must be seized to

permit the agents to locate the things described in the warrant at an off-site location.  The seized

components will be removed from the PREMISES.  If employees of the Company so request, the

agents will, to the extent practicable, attempt to provide the employees with copies of data that

may be necessary or important to the continuing function of the Company's legitimate business.

If, after inspecting the computers, it is determined that some or all of this equipment is no longer

necessary to retrieve and preserve the evidence, the government will return it within a reasonable

time.

## CONCLUSION

64.     As discussed above, RCRA has waste determination requirements and recordkeeping

requirements for generators, transporters and treatment, storage, and disposal facilities of

hazardous waste.  The existence or nonexistence and contents of such records may be evidence

of, or relevant to, both past and ongoing violations of RCRA.  I have probable cause to believe

that evidence of illegal storage and disposal of hazardous waste will be found in business records

maintained by Montana Rifle Company, 3178 MT Highway 35, Kalispell Montana and Seven

Sons Rifle Barrels, Inc., 3172 MT Highway 35, Kalispell Montana.  Based on the information

obtained at this point of my investigation, I believe that there will be physical evidence at these

locations demonstrating that MRC/SSRB illegally disposed of hazardous wastes, as defined by

RCRA, onto the ground in several locations around their facility and illegally disposed of

hazardous waste into the sink and floor drains inside both their facilities (Bldg 1 and Bldg 2),

which likely entered their septic systems.

65.     This alleged disposal is in violation of 42 U.S.C. § 6928(d)(2)(A) (knowing treatment,

storage, or disposal of a listed or identified hazardous waste without a permit).  The location to

be searched is more particularly described in Attachment A to the Application and Affidavit for

Search Warrant (which is attached hereto and incorporated herein by reference).  Items to be

seized are more specifically described in Attachment B to the Application and Affidavit for

Search Warrant (which is attached hereto and incorporated herein by reference).

Kelly J. Siler

Subscribed and sworn before me on this
7th day of August, 2017

U.S. Mag. Judge